## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

HIGHER EDUCATION MANAGEMENT
GROUP, INC. and PATRICK SPADA,
derivatively, and on behalf of ASPEN GROUP,
INC.,

          Plaintiffs,

    v.

MICHAEL MATHEWS, JOHN
SCHEIBELHOFFER, MICHAEL D'ANTON,
C. JAMES JENSEN, DAVID E. PASI,
SANFORD RICH, PAUL SCHNEIER, and
DAVID GARRITY,

          Defendants,

    -and-

ASPEN GROUP, INC.,

          Nominal Defendant.

C.A. No. 9110-VCP

## MEMORANDUM OPINION

Submitted: July 15, 2014
Decided: November 3, 2014

Seth D. Rigrodsky, Esq., Brian D. Long, Esq., Gina M. Serra, Esq., RIGRODSKY & LONG, P.A., Wilmington, Delaware; Jeffrey M. Norton, Esq., Roy Shimon, Esq., NEWMAN FERARA LLP, New York, New York; *Attorneys for Plaintiffs*.

Kathleen M. Miller, Esq., SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Steven M. Kaplan, Esq., Eric S. Schaer, Esq., KAPLAN KRAVET & VOGEL P.C., New York, New York; *Attorneys for Defendants*.

**PARSONS, Vice Chancellor.**

This is primarily a derivative action for breach of the duty of loyalty. The plaintiffs are shareholders of Aspen Group, Inc. ("Aspen Group"), and the defendants are the directors and the former CFO of that company. Aspen Group acquired Aspen University, an online educational institution whose former CEO is a plaintiff, Patrick Spada. The plaintiffs allege that the defendants, in an attempt to mislead educational accreditors, concocted a story that Spada had taken loans from Aspen University while he was CEO. They allege further that certain defendants then pressured the plaintiffs to corroborate the existence of the loans to bolster the company's position for the accreditation inspection. The plaintiffs maintain that there were never any loans, and they charge the defendants with breaching their fiduciary duties by making material misrepresentations in SEC filings and other documents. The plaintiffs also allege that the current CEO of Aspen Group and the rest of the defendants wasted corporate assets and wrongfully diluted the plaintiffs' combined equity stake in Aspen through an improper transfer or issuance of certain stock and convertible warrants. The plaintiffs assert that the former CFO of Aspen Group aided and abetted those alleged fiduciary breaches.

The defendants have moved to dismiss under Rule 12(b)(6) for failure to state a claim and Rule 23.1 for failure to plead adequately demand futility. This Memorandum Opinion constitutes my ruling on the defendants' motion to dismiss. Having considered the preliminary record before me and the arguments presented by counsel on July 15, 2014, I conclude that, as to the claim for breach of fiduciary duty, the plaintiffs have failed to plead adequately that demand upon the board would have been futile. I therefore dismiss the claim for breach of fiduciary duty on that basis. As to the

1

allegations of corporate waste, I find that the plaintiffs have failed to state a claim upon which relief can be granted with respect to the challenged marketing costs and have failed to plead sufficiently that demand would have been futile for the claims regarding the CEO's spending. Regarding the plaintiffs' equity dilution claim, I have determined that the plaintiffs do not have standing to bring a claim regarding the disputed shares of the company's stock because that stock existed before the plaintiffs owned an interest in the company. I further find that the plaintiffs have failed to state a claim with respect to the warrants in question. Lastly, because the plaintiffs have not adequately pled a predicate breach of fiduciary duty, I conclude that they fail to state a claim upon which relief can be granted with respect to the allegation that the former CFO aided and abetted the alleged breaches of fiduciary duties. Thus, I grant defendants' motion to dismiss.

## I. BACKGROUND[1]

### A. Parties

Plaintiffs in this case are Higher Education Management Group, Inc. ("HEMG"), a Nevada corporation, and Patrick Spada (collectively, "Plaintiffs"). All issues surround the alleged actions of Aspen Group, Inc. ("Aspen Group"), a publicly traded Delaware corporation. Defendants Michael Mathews, John Scheibelhoffer, Michael D'Anton, C. James Jensen, David E. Pasi, Stanford Rich, and Paul Schneier (collectively, the

---

[1] Unless otherwise noted, the facts recited herein are drawn from the well-pled allegations of the Verified Derivative Complaint (the "Complaint"), together with its attached exhibits, and are presumed true for the purposes of the defendants' motion to dismiss.

2

"Director Defendants") serve on the board of Aspen Group. Defendant Mathews serves as CEO and chairman. Defendant David Garrity was the CFO and later an Executive Vice President of Aspen Group from June 2011 until October 31, 2013. Plaintiff Spada, who owns and controls HEMG, is the former CEO and chairman of Aspen University, which is now a subsidiary of Aspen Group. In the aggregate, Plaintiffs hold 8.5% of Aspen Group's stock, making them collectively its second largest shareholder.

Spada founded Aspen University, an online educational institution, in 2003. In May 2011, Aspen University merged with Education Growth Corporation, a company controlled by Mathews. Aspen University was the surviving entity, with Mathews replacing Spada as CEO. In September 2011, Spada resigned from the Aspen University Board and Mathews replaced him as Chairman.

In March 2012, Aspen University was acquired by Aspen Group. Aspen Group originally was a Florida public corporation with a different name, but it reincorporated in Delaware in February 2012. Under the terms of the March 2012 merger, Aspen University became a wholly owned subsidiary of Aspen Group, and its board members were appointed to the Aspen Group board of directors. All of the Director Defendants except Rich were directors of Aspen University before the merger, and all Director Defendants became directors of Aspen Group after the merger. Aspen University is accredited by the Distance Education and Training Council ("DETC") and as such is eligible to receive Title IV funding from the United States Department of Education

3

("DOE").[2] To maintain its accreditation and, thus, its Title IV funding, Aspen University must submit documents and financial statements to both the DOE and the DETC to show financial stability.

### B.  The Characterization of Certain Disputed Cash Transfers

Plaintiffs' breach of fiduciary duty claim stems from a disputed transfer of $2,195,084 between Aspen University and HEMG, and how that transaction or series of transactions was reported in SEC filings and accounting statements. In its March 19, 2012 Form 8-K filing, Aspen Group stated that as of "December 31, 2011, [Aspen Group] included as an asset a loan receivable of $2,209,960 from HEMG."[3] Specifically, the Form 8-K stated that:

> In connection with the audit of Aspen's financial statements for 2010-2011, Aspen discovered in November 2011 that HEMG had borrowed $2,195,084 from it from 2005 to 2010 without Board of Directors authority. Aspen has been unable to reach any agreement with Mr. Spada concerning repayment and is considering its options.[4]

In addition, "in order to secure the repayment of that debt," Defendants Mathews, D'Anton, and Scheibelhoffer pledged their shares of Aspen Group stock as collateral.[5]

---

[2]  20 U.S.C. §§ 1070-1099.

[3]  Compl. ¶ 71.

[4]  *Id.* ¶ 72.

[5]  *Id.* ¶ 76.

4

Aspen Group made similar statements in numerous subsequent SEC filings, which are quoted at length in the Complaint.[6]

On April 13, 2012, the SEC Division of Corporate Finance issued a letter to Garrity seeking more information with regard to the purported "loan"[7] and why Aspen Group had recorded it as a secured receivable asset in its accounting statements. The SEC disputed the characterization of the alleged transaction as a secured loan between HEMG and Aspen Group, stating "the amounts related to improper cash advances should have been recorded as a loss due to misappropriation of assets rather than as a receivable."[8] Defendants, through Garrity, defended Aspen Group's right to list the alleged loan as a receivable.

---

[6] Those filings are: (1) a May 7, 2012 Form 8-K/A; (2) a May 15, 2012 Form 10-Q; (3) a May 24, 2012 Form 10-K; (4) a May 29, 2012 Form 8-K/A; (5) an August 15, 2012 Form 12b-25; (6) an August 20, 2012 Form 8-K; (7) an August 20, 2012 Form 8-K/A; (8) an August 20, 2012 Form 10-Q/A; (9) a September 21, 2012 Form 8-K/A; (10) an October 1, 2012 Form S-1; (11) a November 21, 2012 Form S-1/A; (12) a November 21, 2012 Form 10-Q; (13) a March 18, 2013 Form 10-K; and (14) an April 8, 2013 Form S-1.

[7] For the sake of brevity, I will at times in this Memorandum Opinion refer to the disputed $2.2 million transfer as "the Loan," although I intend to convey no conclusion as to whether the Board's treatment of that $2.2 million as a loan was correct according to the law or generally accepted accounting principles in the United States. I also note that the term "the Loan" is meant to encompass all of the disputed transfers. There may have been several transfers. The record is unclear, except for the fact that the total amount involved was approximately $2.2 million.

[8] Compl. ¶ 88.

5

Aspen Group, in an August 20, 2012 Form 10-Q, reported that: "On August 16, 2012, following a series of discussions with the Staff of the SEC, the [Aspen Group] Board approved a write-off of this receivable," *i.e.*, the Loan.[9] Aspen Group also released Mathews, D'Anton, and Scheibelhoffer from their pledge of shares as collateral. Aspen Group further disclosed that it:

> Amend[ed] and restat[ed] in its entirety the [Aspen Group] Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2012 filed on May 15, 2012 (the "Initial 10-Q"). This report was necessary to reflect a restatement relating to the write-off of a loan receivable of approximately $2.2 million owed by a corporation which is believed to still be controlled by Aspen's former Chairman.[10]

In a Form 8-K also filed on August 20, Aspen Group additionally disclosed that it would revise its March 31, 2012 financial statements. On August 30, 2012, the SEC issued another letter to Garrity asking Aspen Group to "clearly indicate that the [August 20 Form 8-K] restatement relates to the correction of an error."[11] In response, Aspen Group, on September 21, 2012, amended its August 2012 Form 8-K to clarify that it had made "an error in the accounting for a loan receivable of approximately $2.2 million owed by a corporation which is believed to still be controlled by Aspen Group's former Chairman."[12]

---

[9]     *Id.* ¶ 105.

[10]    *Id.* ¶ 106.

[11]    *Id.* ¶ 109.

[12]    *Id.* ¶ 110.

In its SEC filings, Aspen Group has continued to describe the transaction that led to the write-off as an "unauthorized loan," discovered by a November 2011 audit (the "Audit").[13] Since the September 21, 2012 Amended 8-K/A, the SEC has not advised Aspen Group that it has any issues with the way that Aspen Group is accounting for the Loan, *i.e.*, as a write-off and not as a receivable.

Plaintiffs vehemently deny that any transfer of money ever occurred, and allege that Aspen Group had actual knowledge that no loan had occurred, even when it was reporting the Loan in its SEC filings. Plaintiffs offer three theories to support these allegations. First, Plaintiffs allege that Defendants have no documentation to prove the existence of the Loan, because Plaintiffs' counsel asked for documentation but never received anything. Second, Plaintiffs argue that, even if the Loan existed, the Defendant Directors were aware of a September 16, 2011 release (the "Release") between Aspen Group and Plaintiffs that released all payment obligations. Third, Plaintiffs aver that each of the Director Defendants knew that the Loan was a fabrication.

Plaintiffs make identical claims that each director approached Spada, asking him to sign two documents. One, an IRS Form 1099-Misc, allegedly would have acknowledged that the Loan existed, and the other would have released Spada and HEMG from any debt obligations arising from the Loan. According to the Complaint, the Director Defendants wanted Spada to sign these documents to bolster Aspen Group's financial statements for the accreditation process.

---

[13]     *Id.* ¶¶ 111-120.

The Complaint also describes a December 11, 2011 meeting between Spada and two Aspen Group board members that purportedly evidences Aspen Group's actual knowledge that there was no Loan. Plaintiffs allege that, on December 11, Spada met with Mathews, Scheibelhoffer, and Ken Mathiesonheld in New York City.[14] At this meeting, Defendants Mathews and Scheibelhoffer allegedly attempted to coerce Spada to corroborate the existence of the Loan. Spada had subsequent conversations with Mathiesonheld and Mathews on February 4, 2012, where each allegedly tried again to convince Spada to acknowledge the Loan. Lastly, on July 25, 2012,[15] Aspen Group's counsel sent a letter to Plaintiffs' counsel, on which he copied Mathews and Garrity, detailing the SEC's insistence that Aspen Group change the Loan from an asset to a write-off on its balance sheet and urging Plaintiffs to corroborate the Loan's existence. These communications, according to Plaintiffs, support a reasonable inference that the Director Defendants knew that the Loan never existed. Plaintiffs thus accuse Defendants of breaching their fiduciary duty of loyalty by knowingly making "false and misleading statements in Aspen Group's financial statements, public filings and other filings and letter correspondence with the SEC."[16]

---

[14] Mathiesonheld is not a party to this case, but is identified in the Complaint as a vice president at Morgan Stanley Smith Barney. *Id*. ¶ 33.

[15] The Complaint mistakenly lists this date as July 25, 2013. *Id*. ¶ 148; *see id*. Ex. D.

[16] *Id*. ¶ 291.

## C.     Allegations of Corporate Waste

In Count II of the Complaint, Plaintiffs assert that Defendants wasted Aspen Group corporate assets. These allegations focus particularly on Mathews's actions as CEO of Aspen Group. Plaintiffs aver that Mathews improperly paid $1.3 million to DKorp, a startup company in which he had an interest, to update and modify the Aspen University website. Plaintiffs also allege that Mathews used Aspen Group funds to pay the rent for office space in New York for Wizard World, another one of Mathews's companies. According to Plaintiffs, the staff in this rental space only worked on Wizard World projects. In addition, Plaintiffs claim that Defendants caused Aspen Group to overspend on its marketing budget. Spada allegedly brought these issues to the attention of the Director Defendants repeatedly, but they did nothing in response. Plaintiffs claim that these actions constituted corporate waste and caused the price of Aspen Group common stock to plummet.

## D.     Allegedly Dilutive Equity Transactions

Plaintiffs' claim in Count III for dilution of shareholder equity involves two distinct incidents. First, Plaintiffs allege that Aspen Group gave 9.76 million shares of its stock for no consideration to the previous shareholder of its predecessor corporation, after the merger between Aspen University and Aspen Group. Aspen Group previously existed as a differently named, inactive shell company. The shell company was a publicly traded Delaware corporation and reported on a March 19, 2012 Form 8-K that it had $1,489 in total assets, $1,489 in total liabilities, and one director, Don Ptalis. Pursuant to the merger, the previous shareholder of Aspen University received

9

25,515,204 shares of Aspen Group. In addition, Aspen Group was "deemed to have issued 9,760,000 shares to the original shareholder of the publicly held entity."[17] Plaintiffs allege that the "issuance" of these 9.76 million shares was dilutive and done in bad faith.

Plaintiffs also dispute Aspen Group's issuance of a total of 33,385,711 stock warrants between March 2012 and October 2013. These warrants had an exercise price of $0.50 per share. Aspen Group's Form S-1 and Form S-1/A filings stated that "there will be no dilution to our existing shareholders except to the extent warrants are exercised."[18] Plaintiffs allege that these warrants had the effect of diluting the equity of shareholder equity and were made in bad faith against the best interests of Aspen Group and its shareholders.

### E.    Garrity's Role

Plaintiffs lastly allege that Garrity, while he served as CFO of Aspen Group, aided and abetted the Director Defendants in the above-described breaches of fiduciary duties in connection with the Loan and alleged misrepresentations in SEC filings.

## II.    ANALYSIS

### A.    Legal Standard

Pursuant to Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle

---

[17]    Aspen Group, Inc., Form 10-K (May 15, 2012). *See infra* note 73.

[18]    Compl. ¶¶ 203-211.

the plaintiff to relief.  As recently reaffirmed by the Supreme Court, "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[19]  That is, when considering such a motion, a court must:

> accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[20]

This reasonable "conceivability" standard asks whether there is a "possibility" of recovery.[21]  The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[22]  Failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim.[23]

In this Court, a shareholder seeking to pursue a derivative claim must meet the additional pleading burden imposed by the demand requirement of Court of Chancery Rule 23.1.  The plaintiff may meet this demand requirement in either of two ways:  (i) by

---

[19]     *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (footnote omitted).

[20]     *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[21]     *Id.* at 537 & n.13.

[22]     *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[23]     *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000).

11

making a demand on the board to undertake a corrective action, or (ii) by demonstrating that such a demand on the board would be futile and, therefore, the plaintiff should be excused from having to make demand.[24] Where the plaintiff fails to comply with the demand requirement and fails to plead with particularity why demand would be futile, the complaint will be dismissed.[25] When considering a motion under Rule 23.1, "the court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences."[26]

The demand requirement flows from the fundamental premise of Delaware corporation law: "The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors."[27] Where a shareholder seeks to initiate a suit on behalf of a corporation, it follows that the board of directors first should be given the opportunity to rectify the alleged wrong without instituting suit or, where litigation has commenced, to control the litigation.[28] As the Delaware Supreme Court explained in *Aronson v. Lewis*, "the demand requirement of

---

[24] *See Beam v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004); *Zapata v. Maldonado*, 430 A.2d 779, 784 (Del. 1981).

[25] *See Haber v. Bell*, 465 A.2d 353, 357, 360 (Del. Ch. 1983).

[26] *Postorivo v. AG Paintball Hldgs., Inc.*, 2008 WL 553205, at *4 (Del. Ch. Feb. 29, 2008) (citing *White v. Panic*, 783 A.2d 543, 549 (Del. 2001)).

[27] 8 *Del. C.* § 141(a).

[28] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) ("[B]y promoting this form of alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations.").

Chancery Rule 23.1 exists at the threshold, first to insure that a shareholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits."[29]  In general, the board's business judgment will receive deference, but a board's business judgment may be rebutted, provided the plaintiff can demonstrate the board does not have the capacity to make an independent and disinterested assessment of the transaction's merits.[30]

The Supreme Court articulated a two-part test in *Aronson* for determining that demand upon a board would have been futile in situations challenging a previous decision by that same board.[31]  In applying that test, this Court must decide whether, given the *particularized* facts alleged, a "reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[32]  Thus, the plaintiff has two options to show demand futility.  First, the plaintiff may plead that a majority of the board is either interested or lacks independence from those who are interested.[33]  Second,

---

[29]  *Id.* at 811-12.

[30]  *See Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 722 (Del. 1971).

[31]  In a different factual context, the analysis might be under *Rales v. Blasband*, 634 A.2d 927 (Del. 1993).  *See* notes 71 and 72, *infra*, and accompanying text.

[32]  *Aronson*, 473 A.2d at 814.  The test is disjunctive; thus, a plaintiff may establish demand futility by meeting either one of the two prongs.  *Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000) ("These prongs are in the disjunctive. Therefore, if either prong is satisfied, demand is excused.").

[33]  *Levine v. Smith*, 591 A.2d 194, 205-06 (Del. 1991).

the plaintiff may allege particularized facts demonstrating that the challenged transaction was not a valid exercise of business judgment.[34]

The test for the first prong of *Aronson* involves examining whether a director is incapable of evaluating the demand objectively, because he or she is interested or not independent. The plaintiff will not succeed, however, in showing the directors are interested simply by stating that the directors acquiesced to the challenged action[35] or approved it,[36] and therefore are interested to the extent they would be required to sue themselves. The question of interestedness usually arises where a director has a personal financial interest in the outcome of the challenged transaction rather than merely an interest in the outcome of the litigation.[37] Nevertheless, "plaintiffs are entitled to a reasonable inference of interestedness where a complaint indicates a substantial likelihood of liability would be found," although this "standard is difficult to meet." [38]

In *infoUSA*, Chancellor Chandler determined that the substantial likelihood of liability standard was met in a case where it was alleged that the board of directors knowingly made misrepresentations to its shareholders. There, the Court held that:

> When a Delaware corporation communicates with its
> shareholders, even in the absence of a request for shareholder

---

[34]    *Id.*

[35]    *See Kaufman v. Belmont*, 479 A.2d 282, 287-88 (Del. Ch. 1984).

[36]    *See Aronson*, 473 A.2d at 815.

[37]    *See Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995).

[38]    *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007).

action, shareholders are entitled to honest communication from directors, given with complete candor and in good faith. Communications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication *with the knowledge* that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders. Such violations are sufficient to subject directors to liability in a derivative claim.[39]

With these standards in mind, I now evaluate whether Plaintiffs adequately have pled demand futility as to their fiduciary duty claims.

## B.   Claims Against the Director Defendants

All of Plaintiffs' claims against the Director Defendants share the same nucleus of facts, beginning with Aspen Group's $2.2 million accounting irregularity that was discovered in the Audit, identified above as the Loan. It is not disputed that the money was unaccounted for as of November 2011 and remains unaccounted for. What is disputed is how that $2.2 million should have been characterized for purposes of Aspen Group's financial statements. The parties also appear to disagree about what happened to the $2.2 million and whose fault it is that the money is missing. For purposes of the motion before me, however, those latter two factual disputes are not material. The money went missing while Spada was CEO of Aspen University. He denies that it was a loan to him or to Plaintiff HEMG. On the other hand, nothing in this preliminary record indicates that Defendants know what happened to the $2.2 million. In any event, as discussed more fully below, the material issue here is whether the Director Defendants

---

[39]   *Id.* (emphasis added).

15

knowingly misrepresented the status of that $2.2 million after it first was discovered and mischaracterized that amount for purposes of the company's accounting records and certain public filings.

### 1. Fiduciary Duty Claims

Plaintiffs allege that the Director Defendants repeatedly made misrepresentations in Aspen Group's SEC filings regarding the Loan. Specifically, they allege that the Director Defendants knowingly misrepresented in SEC filings that the $2.2 million could be considered as a loan. Plaintiffs' theory is that these knowing misrepresentations expose the Director Defendants to a substantial likelihood of liability for fiduciary breaches and, thus, the Director Defendants are "interested" for purposes of the demand futility test articulated in *Aronson*.[40] To meet *Aronson*'s standard in this regard, Plaintiffs must plead with particularity facts supporting a reasonable inference that a majority of the Director Defendants knew that the disputed Loan was a fabrication. Taking all well-pled factual allegations in the Complaint as true, and drawing all reasonable inferences in favor of Plaintiffs, I conclude that Plaintiffs have failed to meet this burden.

### a. Disinterestedness and Independence of the Directors

For purposes of the first prong of *Aronson*, Plaintiffs must plead with particularity that a majority of the Director Defendants, on a director-by-director basis, face a substantial likelihood of liability in order for them to lack disinterestedness and

---

[40] Plaintiffs do not allege that a majority of the Director Defendants were interested or lacked independence on any other basis.

16

independence.[41] To do so, on their theory of the case, Plaintiffs would have to plead non-conclusory facts showing that a majority of directors had knowledge that: (1) there was no Loan; or (2) the underlying $2.2 million would never be paid back. If either of those factual premises are well-pled as to a majority of the Director Defendants, a reasonable inference could be drawn that they knowingly made material misrepresentations on Aspen Group's SEC filings, and therefore face a substantial likelihood of liability, making them "interested" and excusing Plaintiffs' lack of demand.

### i. Did a majority of the Director Defendants knowingly misrepresent the existence of the Loan?

Plaintiffs first assert that the Director Defendants knowingly misrepresented the existence of the Loan. Plaintiffs first contend that Defendants' failure to provide Plaintiffs with proof of the Loan proves its nonexistence. Though the lack of documentation does raise some level of suspicion, that alone cannot support a reasonable inference that a particular director, individually, had knowledge that there was no Loan here.[42] Unauthorized loans or cash advances of the nature described in Aspen Group's SEC filings often are scantily documented, if documented at all. That Aspen Group's counsel did not provide documentation to Plaintiffs' counsel or to the SEC does not

---

[41] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44-45 (Del. Ch. 2013) ("To determine whether the directors approving the transaction comprised a disinterested and independent board majority, the court conducts a director-by-director analysis.") (citing *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000)).

[42] *See Lewis v. Fites*, 1993 WL 47842, at *3-4 (Del. Ch. Feb. 19, 1993) (finding that the entry of an SEC consent order for disclosure violations did not establish director interestedness).

17

support a reasonable inference that the $2.2 million did not represent a loan, such as via a series of cash advances.

Though Plaintiffs quote at length a series of letters between Aspen Group and the SEC, there is nothing contained in those communications that suggests the SEC requested documentation of the Loan or was not convinced that the Loan existed. For example, in an April 13, 2012 letter, the SEC requested that Aspen Group clarify its statement on the Loan to disclose whether Spada "borrowed the $2,209,960 in the form of cash advances or personal expenses . . . . by year."[43] Aspen Group responded on May 4, 2012, with a breakdown of these alleged cash advances year-by-year from 2005 until 2011.[44] On May 17, 2012, the SEC wrote back to Aspen Group that "based on your responses, the amounts related to improper cash advances to [Spada] should have been recorded as a loss due to misappropriation of assets rather than as a receivable."[45]

Plaintiffs provide a detailed record of the interaction between the SEC and Aspen Group. In that record, however, nothing suggests that the SEC asked for, or was dissatisfied with Aspen Group's documentation of the cash transfers in question. Thus, there is support for the assertion that the Board and the SEC had extensive communications about how to characterize the $2.2 million in unaccounted-for funds. There is no support for an inference, however, based on this back-and-forth, that all of the

---

[43] Compl. ¶ 78.

[44] Compl. ¶ 81.

[45] Compl. ¶ 88.

18

Director Defendants would have known that the "loan could not be substantiated" by Aspen Group.[46] I conclude that it would be unreasonable to infer from Aspen Group's communications with the SEC that the individual Director Defendants had knowledge that the Loan was false.[47]

Plaintiffs' second contention in support of their argument that the Director Defendants knowingly misrepresented the existence of the Loan concerns the documents they allegedly urged Spada to execute. The Complaint avers that Defendants appealed to Spada to acknowledge the Loan through an IRS Form 1099 and then sign a separate form which would release Spada from the obligation to pay back the Loan. This request allegedly was for the purpose of shoring up Aspen Group's financial statements to protect its accreditation. The Complaint, in multiple paragraphs, states that the "Individual Defendants", who include the Director Defendants and Garrity, presented Spada with the two sets of forms and attempted to have Spada corroborate their characterization of the Loan. In this regard, the Complaint makes essentially identical allegations against each Director except Mathews.[48] With the exception of Mathews and, possibly, Scheibelhoffer, however, these allegations do not indicate which directors approached

---

[46] *Id*. ¶ 148.

[47] In this regard, I note that Plaintiffs do not allege that the Audit portion of the Aspen Group disclosures is fictitious, nor do they allege that the Audit was a part of the Director Defendants' alleged falsification. Further, Plaintiffs do not allege any particular facts that suggest that the Director Defendants were wrong to rely on the Audit to find that there had been a transfer or loss of funds of some sort.

[48] *See* Compl. ¶¶ 138–141, 148–149, 154–155, 230–277.

19

Spada about the forms or when. Plaintiffs do not allege *with particularity* that each director, individually, participated in proffering the forms to Spada and thereby had knowledge that the Loan was a fabrication.[49] Instead, Plaintiffs attribute identical actions to all of the directors, as a defined group, without providing any context for this assertion. Such broad and identical assertions against the Director Defendants do not meet the requirements for pleading facts with particularity. I therefore conclude that these allegations, in and of themselves, will not suffice to support an inference of knowledge such that Plaintiffs may establish demand futility.

Though Plaintiffs' generalized pleadings cannot suffice to establish demand futility as to a majority of Aspen Group's seven-member board of directors, there are particularized allegations that support an inference that two, and maybe as many as three, of the Director Defendants conceivably had knowledge that there had been no Loan transaction between Aspen University and HEMG. The December 11, 2011 meeting between Spada, Mathews, Scheibelhoffer, and Mathiesonheld is construed by Plaintiffs as evidence that Mathews and Scheibelhoffer knew that there was no Loan. Accepting these factual allegations as true, as I must, and drawing all reasonable inferences in favor

---

[49] *See Khanna v. McMinn,* 2006 WL 1388744, at \*12 (Del. Ch. May 9, 2006) ("Pleading with particularity is essential for a plaintiff to satisfy the requirements of demand excusal. Indeed, such 'pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a).'") (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)). The requirement for particularized pleading, as defined by *Brehm*, is "particularized factual statements that are essential to the claim. Such facts are sometimes referred to as 'ultimate facts,' 'principal facts' or 'elemental facts.'" *Brehm*, 746 A.2d at 254.

of Plaintiffs, there is support in these particular allegations to find that Mathews and Scheibelhoffer may have had knowledge that there was no Loan, and thus establish a substantial likelihood of liability for those two defendants. Similarly, the February 4, 2012 conversation between Mathews and Spada also supports an inference that Mathews had actual knowledge.[50] I therefore conclude that Plaintiffs have pled sufficient facts to raise a doubt as to whether Mathews and Scheibelhoffer could have exercised independent judgment because of the likelihood of liability on their part. Accordingly, I consider both of these Director Defendants "interested" for the purposes of the demand futility inquiry here.

---

[50] Specifically, in paragraph 145 of the Complaint, Spada recounts an exchange with Mathews, where Mathews allegedly said to Spada:

> The last thing we want to do is re-file our income statement with the Department of Education. If we do, I think we're in deep trouble. We don't want to post this as a series of business expenses or as compensation to you because if we do than [sic] we have to file our income statement over again. So, the only way to do this so that we only have to re-file the balance sheet is by saying that the two million dollars is a loan to HEMG. Okay? And that way it's the cleanest way and where the Department of Education doesn't have any questions and it doesn't look like there's anything improper going on.
>
> All I care about is filing an audit that the Department of Education doesn't think twice about. I am so comfortable with this approach that I am willing to agree to pay you 50 cents per share for whatever you want to sell. Patrick, if we can complete this agreement and just hold a couple of millions of your shares as collateral, you walk away, you walk away as a happy clean guy and you and I have a great relationship for years.

21

When examining the other five Director Defendants, however, there are no particularized pleadings on a director-by-director level that would support a reasonable inference that two or more of them, *i.e.*, enough to comprise a majority of the board, would have been exposed to a substantial likelihood of liability. In contrast to the allegations regarding Mathews and Scheibelhoffer, there are no particularized, non-conclusory allegations regarding any other Director Defendants. Instead, there are only generalized and conclusory allegations that all of them attempted to coerce Spada to sign the two forms.[51] Later in the Complaint, Plaintiffs allege that each of the remaining five Director Defendants "authorized" Defendants' presentation to Spada of the two documents and apparently the actions of Mathews described above.[52] There are, however, no particularized facts that support any of these allegations. For example, there are no allegations that these actions were discussed at a board meeting, were the subject of any board presentations, or even were discussed by Mathews or Scheibelhoffer with any of the other Director Defendants. Thus, I find that the Complaint does not support a reasonable inference that two or more of the other five Director Defendants knew that there was in fact no Loan.[53] I also cannot infer, therefore, that a majority of the Board faces a substantial likelihood of liability.[54]

---

[51]    Compl. ¶¶ 139-41, 154-55, 148-49.

[52]    *Id*. ¶¶ 248, 257, 266, 275, 284.

[53]    I note that, as to these five Director Defendants, the allegations are identical with the exception that D'Anton is alleged to have signed the Pledge Agreement discussed in more detail in the next section. It is not clear that D'Anton's

### ii. Did a majority of the Director Defendants knowingly misrepresent that the Loan was collectible?

Plaintiffs also contend that even if, *arguendo*, the Director Defendants did not knowingly misrepresent the existence of the Loan, they knew that the Loan was not collectible and therefore knowingly mischaracterized it as a receivable. As to this theory, however, Plaintiffs still have not met their burden to allege particularized facts that would support an inference that a majority of the Director Defendants, when considered individually, had knowledge that the Loan was not collectible.

In this regard, Plaintiffs point to the Release signed by Mathews and Spada on September 16, 2011, the same month Spada resigned from Aspen University. The Release releases Spada from all payment obligations owed to Aspen University "upon or by reason of any matter, cause or thing whatsoever, from the beginning of the world to

---

agreement to pledge his shares as security for the Loan supports a reasonable inference that he was knowingly misrepresenting the existence of the Loan. Even if that were to be assumed, however, it would mean that at most three out of the seven Aspen Group directors potentially may have had actual knowledge, which is not enough to call into question the disinterestedness and independence of a majority of the Board.

[54] *See Rattner v. Bidzos*, 2003 WL 22284323, at \*11 (Del. Ch. Sept. 30, 2003) (holding that directors cannot be charged with knowledge of information merely because they served on a board with a director who may have known such information); *see also Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008) (finding that demand had not been excused when the "Complaint alleged many violations of federal securities and tax laws but does not plead with particularity the specific conduct in which each defendant 'knowingly' engaged, or that the defendants knew that such conduct was illegal.")

the date of [the Release]."[55] For purposes of this Memorandum Opinion, I assume that each Defendant Director knew of the Release. Nevertheless, I conclude that Plaintiffs have not pled facts sufficient to support a reasonable inference that the Director Defendants knew the Loan was not recoverable. The Director Defendants discovered the unaccounted for $2.2 million in November 2011 based on the Audit, which occurred after the Release had been signed. Because of this timing, it is conceivable that the Director Defendants believed that, notwithstanding the Release, they still might be able to assert a claim against Spada or HEMG to recover the $2.2 million. Defendants stated as much in a May 29, 2012 letter to the SEC, where Mathews, writing for Aspen Group, said "we believe we will collect the outstanding receivable."[56] As justification for this belief, Mathews pointed to the large amount of Aspen Group stock owned by HEMG and Spada. In the event of a dispute, that stock might have been important. In addition, when Aspen Group initially reported the Loan in its March 19, 2012 Form 8-K, it disclosed that "three of Aspen's directors pledged 2,209,960 shares of common stock (at the value of $1.00 per share) to secure payment of this loan receivable."[57] This fact supports an inference that the Director Defendants believed that the $2.2 million Loan would be repaid either by Plaintiffs or through the pledged shares. Those pledged shares also undermine the

---

[55] Compl. ¶ 136.

[56] *Id.* ¶ 95.

[57] *Id.* ¶ 72. Director Defendants Mathews, D'Anton, and Scheibelhoffer pledged their shares. *Id.*

24

contrary inference Plaintiffs would have this Court draw to the effect that the Director Defendants knew the unaccounted for $2.2 million would not be repaid. This conclusion is buttressed by the fact that the Board released those pledged shares once Aspen Group recharacterized the Loan as a loss on its financial statements at the behest of the SEC.

Taking all facts in the Complaint as true, there are reasonable grounds for inferring that the Director Defendants may have believed that the Loan was indeed recoverable. Plaintiffs allege, however, that throughout this period these Defendants knew that there was no hope of recovering any of the Loan. There simply are no particularized facts in the Complaint that support such an inference. Viewing the factual record in the light most favorable to Plaintiffs, it is reasonably conceivable that the Director Defendants knew about the Release and that it might be difficult to recover all or part of the missing $2.2 million from Plaintiffs. A close analysis of the Release may have shown it would be unrealistic to expect to recover anything from Plaintiffs even if they simply had misappropriated the $2.2 million unbeknownst to Aspen Group or Aspen University.

In that regard, the Director Defendants may have acted with less than due care in reaching their belief the Loan could be recovered from Plaintiffs. Absent further particularized pleadings, however, I cannot infer that a majority of the Director Defendants, individually, knew that the Loan could not be recovered from the Plaintiffs or the pledged stock and thus made knowing misrepresentations in Aspen Group's public statements.

In arguing for a contrary result, Plaintiffs rely on *infoUSA* as support for their contention that the Director Defendants were "interested" for purposes of the first prong

25

of *Aronson*. An important distinction between this case and *infoUSA*, however, is that the directors in *infoUSA* had received a report that they then ignored in making their misrepresentations. The presence of that report supported an inference that the directors of infoUSA had actual knowledge, for purposes of an analysis under the first prong of *Aronson*, that they were making material misrepresentations to infoUSA shareholders. On that basis, Chancellor Chandler concluded that the infoUSA directors faced a substantial likelihood of liability.[58]

Here, I am not able to draw such an inference of knowing falsification or deception. There are particularized facts in the Complaint that support an inference of knowledge as to two directors, but there are not sufficient facts alleged in the Complaint to find that a majority of the board knowingly made a material misstatement on Aspen Group's SEC filings and thus likely would be subject to liability.[59] Plaintiffs have not shown, therefore, that a majority of the Director Defendants were interested or lacked independence because they faced substantial likelihood of liability, and thus have not adequately pled demand futility under that theory.

---

[58] *infoUSA*, 953 A.2d at 990 ("Communications that depart from [the expectation of honest communication from directors], particularly where it can be shown that the directors involved issued their communication with the *knowledge* that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders"); *see also Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998) ("When the directors are . . . *deliberately* misinforming shareholders about the business of the corporation . . . by a public statement, there is a violation of fiduciary duty.").

[59] *See Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003) (finding that demand was not excused when only two out of seven board members had been deemed interested); *see also supra* note 54.

26

### b.       Business Judgment

The inquiry under the second prong of *Aronson* examines if the challenged transaction "was otherwise the product of a valid exercise of business judgment."[60] Whereas the first prong of *Aronson* seeks to determine whether a majority of the board properly could assess a demand because of their interest or lack of independence in terms of the challenged transaction, this second prong focuses on the transaction itself. To succeed on the second prong, Plaintiffs must show that the challenged transaction did not reflect the exercise of valid business judgment. This type of conduct is limited to the extreme case of directorial failure, such as one of the "rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability exists."[61]

For a plaintiff to rebut the presumption of the business judgment rule, that plaintiff must plead particularized facts to raise reasonable doubt either that the action was taken honestly and in good faith, or that the board was adequately informed in making its decision.[62] Plaintiffs here attempt to rebut the business judgment rule by alleging that the Director Defendants acted dishonestly and in bad faith, thus violating the duty of loyalty.[63] This is "a task closely akin to proving that the underlying transaction could not

---

[60]    *Aronson*, 473 A.2d at 814.

[61]    *Id.* at 815.

[62]    *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003).

[63]    Due to Aspen Group's exculpation clause under 8 Del. C. § 102(b)(7),  there would be no recourse for Plaintiffs and no substantial likelihood of liability if the

27

have been a good faith exercise of business judgment."[64] Plaintiffs here fall short of this high pleading threshold. The characterization of the missing $2.2 million as a Loan that probably was recoverable does not fall into the category of decisions so egregious that board approval cannot be a valid exercise of business judgment. As discussed above, there is no support in the Complaint for a reasonable inference that a majority of the Director Defendants knew that there was no Loan. Similarly, there is no support for the inference that Director Defendants knew that the Loan was unrecoverable.

The closest the Complaint comes to pleading non-conclusory facts suggesting that the Board violated the duty of loyalty is the set of allegations regarding Mathews's and Scheibelhoffer's attempted "coercion" of Spada to execute the Form 1099 documents. Plaintiffs contend that these facts demonstrate knowledge sufficient to infer that the Director Defendants acted in bad faith with respect to the characterization of the Loan. While Plaintiffs have pled sufficient facts to support an inference that Mathews and Scheibelhoffer conceivably may have had knowledge that the statements regarding the existence of the Loan were false, Plaintiffs' allegations do not support an inference of bad faith conduct by a majority of the Director Defendants, and I cannot impute one

---

Director Defendants' only failing was that they had not become fully informed. *See Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 367 (Del. 1993) (finding that the duty to act on an informed basis falls within the duty of care).

[64]    *infoUSA*, 953 A.2d at 972.

director's knowledge to all other directors.[65] Thus, I conclude that Plaintiffs have not pled particularized allegations of a breach of the duty of loyalty. Plaintiffs, therefore, have failed to show that demand would have been futile under either prong of *Aronson*. Because their claim for breach of fiduciary duty fails to meet the heightened pleading standard under Rule 23.1, I dismiss Count I for lack of demand.

## 2. Waste Claims

In Count II of the Complaint, Plaintiffs make two general allegations regarding corporate waste: first, that the Aspen Group board, as a whole, wasted corporate assets on marketing and second, that the Director Defendants did not stop Mathews, in his capacity as CEO, from wasting corporate assets.

The standard for adequately pleading corporate waste is high and rarely satisfied. To recover on a waste claim, a plaintiff has the burden of proving that a transaction was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."[66] A claim of waste will be sustained only in the rare, "unconscionable case where directors irrationally squander or give away corporate assets."[67] This standard is a corollary of the proposition that where

---

[65]   *Desimone v. Barrows,* 924 A.2d 908, 943 (Del. Ch. 2007) ("Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes. Rather, a derivative complaint must plead facts specific to each director, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand.").

[66]   *Walt Disney*, 906 A.2d at 74 (quoting *Brehm*, 746 A.2d at 263).

[67]   *Id.*

the presumption of the business judgment rule is applicable, the decision of a corporate board of directors will be upheld unless it cannot be "attributed to any rational business purpose."[68]

Turning first to the allegation that Defendants wasted corporate assets by Aspen Group's increased spending on marketing and promotional costs, I am not persuaded based on the facts that such spending conceivably could be found to be "unconscionable" or spending for which Aspen Group received no benefit. Plaintiffs have not argued that Aspen Group received inadequate consideration in return for this spending, but rather that Aspen Group was simply spending too much on marketing. Decisions on what to spend on marketing and promotions fall squarely within the purview of the Director Defendants' business judgment. Plaintiffs may disagree with the Board's decision to spend that much money on marketing, but absent any further allegations, they have failed to adequately state a waste claim sufficient to survive a motion under Rule 12(b)(6).[69]

Mathews's decisions as CEO to pay $1.3 million to DKorp for website upgrades and allegedly to rent space for Wizard World come closer to stating a claim under the Rule 12(b)(6) standard. Because this is a derivative claim, however, Plaintiffs also must meet the demand futility standard under Rule 23.1. Unlike the fiduciary duty claims, here Plaintiffs are accusing the board of not taking action to prevent Mathews, as CEO,

---

[68] *Id.* (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971), and *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985)).

[69] *See White v. Panic*, 783 A.2d 543, 554-55 (Del. 2001).

from wasting corporate assets.[70] Derivative suits that do not challenge a board's actions, such as a suit questioning a transaction on transactions that were not presented to the board for decision, are examined under the *Rales* standard.[71] A *Rales* inquiry examines "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint was filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[72] Here, Plaintiffs have alleged no particularized facts that conceivably could show that any Director Defendant, besides Mathews, was interested in the challenged transactions. Similarly, Plaintiffs do not plead that any Director Defendant is beholden to Mathews or otherwise not independent for any reason. Thus, Plaintiffs have not pled particularized facts that could support a reasonable inference that the Aspen Group board could not have exercised its independent and disinterested business judgment in responding to a demand challenging the subject transactions. As such, Plaintiffs have not pled demand futility here. I find, therefore, that

---

[70] "Mathews was spending hundreds of thousands of dollars per month . . . such as giving $1.3 million to DKorp," and "Mathews also used Aspen Group's funds to pay the cost of rent . . . for Wizard World staff." Compl. ¶¶ 161-62. Plaintiffs do not allege that the board of Aspen Group approved these transactions.

[71] *Rales*, 634 A.2d at 934 (listing three scenarios under which the *Rales* standard will apply); *see also infoUSA*, 953 A.2d at 986-97 (finding that claims for waste are still subject to the demand requirement and that when the challenged transactions were not approved by the board, the *Rales* standard applies).

[72] *Rales*, 634 A.2d at 934.

as to the claim for waste, Plaintiffs have failed to meet the heightened standard of Rule 23.1 for pleading demand futility. Thus, Count II must be dismissed.

### 3. Dilution

In Count III of their Complaint, Plaintiffs point to two types of Aspen Group security issuances that they contend were dilutive to their equity: the 9.76 million shares of Aspen Group common stock that were held by the original owners of the predecessor public shell company and the warrants issued between 2012 and 2013.

As to the 9.76 million shares that went to the original owners of the public shell company, I find that Plaintiffs lack standing to bring this claim. Plaintiffs address this claim in paragraph 196 of their Complaint, and refer this Court to a Form 8-K filed with the SEC on March 19, 2012.[73] Page 2 of that Form 8-K states that, "As of the closing of the Reverse Merger, the Public Company had 9,760,000 shares of common stock outstanding and $20,000 of convertible notes convertible into 20,000 shares of common stock. The Public Company issued Aspen [University] shareholders 25,515,204 shares of common stock." Though Plaintiffs allege that these 9.76 million shares were issued to the shareholders of Aspen Group's predecessor shell company *after* the merger, the Form 8-K that they rely on refutes that allegation. Plaintiffs reference this 8-K without disputing any of its contents. I conclude, therefore, that the Plaintiffs did not own stock

---

[73] Aspen Group, Inc., Form 8-K (March 19, 2012). At this motion to dismiss stage, this Court may take judicial notice of publicly available facts such as those contained in filings made with the SEC, like this Form 8-K. *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006).

in the shell company at the time that those 9.76 million shares were issued because Plaintiffs have not alleged that they owned shares of Aspen Group before the merger, when it existed as a shell company.

As a result, Plaintiffs have failed to meet the standard for derivative standing articulated in DGCL Section 327, which provides: "[i]n any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains. . . ." Because Plaintiffs did not own stock of the shell company before the merger, they do not have standing to bring this aspect of the dilution claim, challenging the pre-merger issuance of stock to the prior owners of Aspen Group.

I turn next to the convertible warrants. Section 157(a) of the DGCL enables corporations to create and issue warrants.[74] "The power to issue stock options rests with the board, and, '[i]n the absence of *actual fraud* in the transaction, the judgment of the directors as to the consideration for the issuance of such rights or options and the sufficiency thereof shall be conclusive.'"[75] Plaintiffs allege that the warrants were issued

---

[74] 8 *Del. C.* § 157(a) provides: "Subject to any provisions in the certificate of incorporation, every corporation may create and issue, whether or not in connection with the issue and sale of any shares of stock or other securities of the corporation, rights or options entitling the holders thereof to acquire from the corporation any shares of its capital stock of any class or classes, such rights or options to be evidenced by or in such instrument or instruments as shall be approved by the board of directors."

[75] *Telxon Corp. v. Bogomolny*, 792 A.2d 964, 976 (Del. Ch. 2001) (quoting 8 *Del. C.* § 157) (emphasis added).

33

in bad faith and against the best interests of Aspen Group, but have not suggested that the Director Defendants acted fraudulently or contrary to Aspen Group's certificate of incorporation or bylaws in issuing the warrants. Under Rule 12(b)(6), failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss the claim.[76] Plaintiffs have not alleged any non-conclusory facts that conceivably would show or support a reasonable inference that Defendant Directors acted fraudulently or in bad faith in issuing the warrants. I therefore dismiss the aspect of Count III claiming that the warrants were dilutive for failure to state a claim.

## C.      Aiding and Abetting

Because the claims for breach of fiduciary duties have been dismissed, I also dismiss the claim that Garrity aided and abetted such breaches by the Defendant Directors. One of the necessary elements of an aiding and abetting claim is an underlying or predicate fiduciary breach.[77] As a separate and independent reason for dismissing the aiding and abetting claim against Garrity, I note that, as an executive officer, *i.e.*, the CFO of Aspen Group, Garrity himself owes fiduciary duties to the corporation, and

---

[76]      *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000).

[77]      *DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *36 (Del. Ch. Sept. 30, 2013) (dismissing an aiding and abetting claim because the breach of duty claims had also been dismissed, and holding that "a claim for aiding and abetting a breach of fiduciary duty or contractual fiduciary duty requires an underlying breach that was aided or abetted."); *see also Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002) ("The elements of a claim for aiding and abetting a breach of a fiduciary duty are: (1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary.").

therefore any conduct of his rising to the level of aiding and abetting would be a breach of his own fiduciary duties.[78] Accordingly, I dismiss Count IV under Rule 12(b)(6)

### III. CONCLUSION

For the reasons stated in this Memorandum Opinion, I grant Defendants' motion in its entirety.

**IT IS SO ORDERED**.

---

[78] *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009) (holding that "officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, that the fiduciary duties of officers are the same as those of directors," and that a director who allegedly "aided and abetted" another director's loyalty breach would have breached his own duty of loyalty).